United States District Court
Southern District of Texas
**ENTERED**
August 07, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| RICHARD SCOTT SHAFER, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:22-CV-00049 |
| | § | |
| JERRY SANCHEZ, *et al*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND RECOMMENDATION
TO GRANT PLAINTIFF'S RENEWED
MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Richard Scott Shafer, a Texas inmate appearing *pro se* and *in forma pauperis*, has filed this prisoner civil rights action pursuant to 42 U.S.C. § 1983.  Pending before the Court is Plaintiff's motion to reconsider the denial of his motion for preliminary injunctions, which is construed as his renewed motion for preliminary injunctive relief. (D.E. 106).  On July 20, 2023, the undersigned conducted an evidentiary hearing on Plaintiff's motion.  For the following reasons, the undersigned RECOMMENDS that Plaintiff's renewed motion for preliminary injunctive relief be GRANTED.

**I.      JURISDICTION**

The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.  This case has been referred to the undersigned magistrate judge for case management and making recommendations on dispositive motions pursuant to 28 U.S.C. § 636.

## II.    BACKGROUND

Plaintiff is a prisoner in the Texas Department of Criminal Justice, Criminal Institutions Division (TDCJ-CID). Plaintiff's claims and allegations in this action arise in connection with his current assignment to the McConnell Unit in Beeville, Texas.

In his Second Amended Complaint, which is currently the operative pleading in this case, Plaintiff sues the following defendants: (1) former McConnell Unit Warden Jerry Sanchez; (2) TDCJ Director Bobby Lumpkin; (3) Captain Andrew Nino; (4) Sergeant Samuel Reyes; (5) Officer Antonio Gamez; (6) Officer Lara; (7) UGI Ashley Johnson; (8) Officer Benjamin Garner; and (9) Officer Jonathan Montoya.  (D.E. 56, pp. 1, 4).  Plaintiff sues Sanchez and Lumpkin in their official capacities for declaratory and injunctive relief. (*Id.* at 4).  Plaintiff sues Nino, Reyes, Gamez, Lara, Johnson, Garner, and Montoya in their individual and official capacities for declaratory, injunctive, and monetary relief.  (*Id.*). To date, the parties have been unable to identify Defendant Lara.  (*See* D.E. 86).

Plaintiff generally claims that Defendants acted with deliberate indifference to his health in violation of his Eighth Amendment rights by subjecting him to: (1) excessive heat conditions in the summers of 2020 and 2021; and (2) infestations of rodents and cockroaches that carry disease. (*Id.* at 4-9). In addition to monetary and declaratory relief, Plaintiff seeks injunctive relief in the form of compelling Defendants to install air conditioning units in all areas of the McConnell Unit such as inmate housing areas. (Id. at 9-10).

At the time he filed his original complaint, Plaintiff moved the Court for preliminary and permanent injunctive relief by seeking, among other requests, immediate placement in air-conditioned housing with allowances to conduct his normal routines. (D.E. 2). In a Memorandum and Recommendation issued on April 19, 2022 (April 19, 2022 M&R), the undersigned recommended that Plaintiff's motion be denied, concluding that Plaintiff had failed to satisfy each of the four required elements for preliminary injunctive relief. (D.E. 13, pp. 4-9). District Judge Nelva Gonzales Ramos adopted the April 19, 2022 M&R. (D.E. 74, pp. 2-6).

## III.   PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

On June 20, 2023, the Court received Plaintiff's motion to reconsider the denial of his motion for preliminary injunction. (D.E. 106). The undersigned notes that the South Texas area, including the city of Beeville where the McConnell Unit is located, has and is enduring an extensive heat wave during the summer months. Plaintiff's motion is construed as a renewed motion for preliminary injunctive relief based on the current heat conditions at the McConnell Unit. Plaintiff states the following in his motion:

- Plaintiff has been suffering in the recent days from various heat-related illnesses, including dizziness, nausea, lack of sweating, muscle cramps, and fainting.

- Excessive heat conditions are present in the McConnell Unit's housing areas, chow hall, and other areas not air-conditioned.

- Respite areas or cold showers have not been made available to Plaintiff the last few days.

- Officers are not conducting wellness checks and are not carrying heat-restriction lists with them.

- Plaintiff has requested during this period to go to a respite area at least three times a day and has been denied by staff each time.

- Staff has informed Plaintiff each time on these occasions that respite areas are full.

- Staff also has refused to allow Plaintiff to seek medical attention for heat-syncope and other heat-related illnesses.

- Since March 5, 2023, five inmates have died because their medical conditions "were compromised by the heat."

- Plaintiff also suffers from medical conditions making him susceptible to heat.

- Plaintiff takes medications which greatly affect his body's ability to cool itself.

(D.E. 106, pp. 1-3).  Plaintiff requests that he be placed in an air-conditioned cell while this case remains pending.  (*Id.* at 3).

On July 20, 2023, the undersigned conducted an evidentiary hearing on Plaintiff's motion for preliminary injunctive relief.  (D.E. 121).  The parties presented the following evidence at the hearing:

- Plaintiff's testimony (*id.* at 11-37);

- Testimony of Dr. Jane Leonardson ("Dr. Leonardson") (*id.* at 38-55);

- Testimony of TDCJ Regional Director Jerry Sanchez ("Director Sanchez") (*id.* at 55-68);

- Testimony of Dr. Isaac Kwarteng ("Dr. Kwarteng") (*id.* at 69-91);

- Testimony of Warden Elbert Holmes ("Warden Holmes")[1] (*id.* at 92-114); and

- Defendants' Exhibits consisting of:

  Exh. 1    AD-10.64 (D.E. 115-1);
  Exh. 2    Heat Scoring Sheet (D.E. 115-2);
  Exh. 3    Respite Tracking Form (D.E. 115-3);
  Exh. 4    Plaintiff's Step 1 grievances (D.E. 115-4);
  Exh. 5    Plaintiff's List of Medical Conditions (D.E. 115-5); and
  Exh. 6    Plaintiff's Medical Records (D.E. 115-6).

## IV.  DISCUSSION

### A.  Governing Legal Standard

A federal court may grant a preliminary injunction "to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits." *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017) (restating and agreeing with the district court's framework in determining whether to grant a preliminary injunction).  A court should grant a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a) if the movant establishes the following: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Robinson v. Hunt Cnty., Texas*, 921 F.3d 440, 451 (5th Cir. 2019) (quoting *Speaks v. Kruse*, 445 F.3d 396, 399-400 (5th Cir. 2006)).

---

[1] The record reflect that Warden Holmes is no longer the warden at the McConnell Unit.  The undersigned nevertheless will refer to him was Warden Holmes.

The Fifth Circuit has cautioned that granting a preliminary injunction "is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)); *see also Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013); *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985) ("The decision to grant a preliminary injunction is to be treated as the exception rather than the rule.").

In cases involving prisoners, courts are particularly reluctant to grant requests for a preliminary injunction, as "judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration." *Wagner v. Campuzano*, No. 1:12-CV-205-C, 2013 WL 12147778, at *1 (N.D. Tex. May 31, 2013) (citing *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995)). The Prison Litigation Reform Act (PLRA) even instructs that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1)(A).

**B.  Substantial Likelihood of Success on the Merits**

Plaintiff first must demonstrate a likelihood of success on the merits with respect to his Eighth Amendment claims of deliberate indifference in order to obtain preliminary injunctive relief. *Robinson*, 921 F.3d at 451. The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. amend. VIII. "The Constitution does not mandate

comfortable prisons . . . but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Harper v. Showers*, 174 F.3d 716, 719 (5th Cir. 1999) (quoting *Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995) (per curiam) (internal quotations omitted)). Prison officials must provide humane conditions of confinement and ensure that inmates receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Conditions that result in "unquestioned and serious deprivations of basic human needs" or "deprive inmates of the minimal civilized measure of life's necessities" violate the Eighth Amendment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *see also Hudson v. McMillian*, 503 U.S. 1, 8-10 (1992).

Extreme temperatures in prison can violate the Eighth Amendment. *Yates v. Collier*, 868 F.3d 354, 360 (5th Cir. 2017); *Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015); *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004). "To be tantamount to the infliction of cruel and unusual punishment, prison conditions must pose an unreasonable risk of serious damage to a prisoner's health—an objective test—and prison officials must have acted with deliberate indifference to the risk posed—a subjective test." *Ball*, 792 F.3d at 592 (internal quotation marks omitted) (affirming holding that Eighth Amendment was violated when prisoners who were being treated for hypertension and diabetes were held in very hot cells without sufficient access to heat-relief measures); *see Webb v. Livingston*, 618 F. App'x 201, 208–09 (5th Cir. 2015) (affirming holding that inmates with heat-sensitive medical

conditions who were housed in cells where the temperature exceeded 100 degrees had asserted facts that, if proven, would overcome qualified immunity). "Without the requisite proof of both subjective and objective components of an Eighth Amendment violation, however, merely 'uncomfortable' heat in a prisoner's cell does not reflect a 'basic human need that the prison has failed to meet' and is not constitutionally suspect." *Id*. 792 F.3d at 592 (citing *Woods*, 51 F.3d at 581).

In his Second Amended Complaint, Plaintiff alleges that the combination of his age, weight, physical issues, PTSD, and current medications place him at a greater risk for heat-related illness. (D.E. 56, p. 5). He further alleges that his Eighth Amendment rights are being violated because: (1) the McConnell Unit officials limit the amount of time offenders can spend in a respite area (*id.* at 4-5); (2) several named defendants have denied him requested measures, such as showers or placement in an air-cooled respite areas to alleviate his excessive heat symptoms (*id.* at 5-7); and (3) on two occasions, August 5, 2020 and September 14, 2020, Plaintiff passed out from the heat after being denied his requests for showers or respite (*id.* at 5-6).

In his renewed motion for preliminary injunction, Plaintiff asserts that violations of his Eighth Amendment rights remain ongoing as he continues to be denied adequate respite from the heat despite his susceptibility to excessive heat and the fact the South Texas region is under the grip of a severe Texas heat wave. As discussed below, Plaintiff has established a substantial likelihood of success with respect to his deliberate indifference claims concerning the excessive heat conditions present in his living area and throughout the

common areas of the McConnell Unit.  The evidence presented at the hearing satisfies both the objective and subjective tests to show ongoing violations of his Eighth Amendment rights.

### 1. *Plaintiff has shown a substantial risk of serious injury or death as a result of the heat conditions at the McConnell Unit.*

To demonstrate that prison conditions impose an unreasonable risk of serious damage to a prisoner's health under the objective test, an inmate need not show that a death or serious injury already has occurred but rather that there is a "substantial risk of serious harm." *Ball*, 792 F.3d at 593 (citing *Gates*, 376 F.3d at 333).  "The Fifth Circuit has found extreme heat in prisons to violate the Eighth Amendment when insufficient mitigation measures are used."  *Cole v. Collier*, No. 4:14-CV-1698, 2017 WL 3049540 (S.D. Tex. July 19, 2017) (Ellison, J.) (citing *Ball*, 792 F.3d at 584 and *Gates*, 376 F.3d at 339).

In *Ball*, the Fifth Circuit listed the following several heat mitigation measures that prison officials could take such as diverting cool air from the guards' pod into the tiers, allowing inmates to access air conditioned areas during their tier time; allowing access to cool showers at least once a day, providing an ample supply of cold drinking water and ice at all times, and supplying personal ice containers and individual fans.  *Ball*, 792 F.3d at 599.  "But in listing those measures, the Fifth Circuit did not hold that those were the only measures necessary to meet the requirements of the Eighth Amendment."  *Cole*, 2017 WL 3049540, at *39.  The Fifth Circuit has determined that a district court's order to air condition Louisiana's death row violated the PLRA, which requires courts to fashion remedies that eliminate the constitutional remedy without more.  *Ball*, 792 F.3d at 599.

"Because measures short of air conditioning existed but had not been implemented, the Fifth Circuit found that those injuries could eliminate the injury in a less intrusive manner than air conditioning," *Cole*, 2017 WL 3049540, at *39 (citing *Ball*, 792 F.3d at 599).

Plaintiff has offered substantial and compelling testimony at the evidentiary hearing regarding his various medical and mental health conditions, as well as the medications he takes, which make him susceptible to excessive heat conditions.   Specifically, Plaintiff testified that:

- Plaintiff suffers from PTSD, night tremors, anxiety, injuries to his knees and back, nerve pain arising from a bone pushing into his spine, cardiovascular disorder, shoulder problems, and traumatic brain disease.  (D.E. 121, pp. 11-12).

- Plaintiff is 53-year-old, weighs 240 pounds, and is 5'11" tall.  (*Id.* at 12).

- Plaintiff takes Ibuprofen for pain, Loratadine, Claritin, Effexor, and aspirin to thin his blood.  (*Id.* at 13-14).

- Effexor is an antipsychotic which affects the hypothalamus and impairs his ability to perspire.  (*Id.* at 12).

- Claritin and Loratadine also affect the hypothalamus and impact his ability to perspire.  (*Id.*  at 13).

- When Plaintiff is impacted by excessive heat, he suffers from heat rash, delirium, disorientation, excessive sweating, and muscle cramps. (*Id.* at 14).

- Since the beginning of the 2023 heat wave, he has passed out five times from excessive heat conditions  (*Id.*).

- From June 9 to June 13, 2023, Plaintiff described the conditions in the chow room and day room as excessively hot.  (*Id.* at 16).

- From June 9 to June 13, 2023, Plaintiff described his cell as twice as hot as the day room, estimating temperatures on his cell to be between 99-105 degrees from June 9 to June 13, 2023.  (*Id.* at 17).

- From June 9 to June 13, 2023, Plaintiff suffered nausea, headaches, profuse sweating followed by no sweating, clammy skin, dizziness, disorientation, and fainting.  (*Id.*).

- Plaintiff has suffered heat-related illnesses and conditions every day until the July 20, 2023 evidentiary hearing.  (*Id.* at 28).

- Plaintiff believes the temperatures in his cell and other common areas to be 100-101 degrees.  (*Id.* at 31).

- Plaintiff suffered from a heat rash on the day of the evidentiary hearing.  (*Id.* at 31-32).

While Plaintiff's testimony as to his susceptibility to excessive heat and heat illnesses suffered during the current heat wave are highly credible, Defendants presented evidence at the evidentiary hearing to show that various heat-mitigation respite measures were made available to inmates at the McConnell Unit under AD-10.64 and that Plaintiff received the benefit of significant heat mitigation measures, including respite, from the heat.   Defendants submitted into evidence the latest version of AD-10.64 (entitled "Excessive and Extreme Temperature Conditions in TDCJ"), effective May 8, 2020, which was adopted to address extreme temperature conditions in the TDCJ. (D.E. 115-1).

AD-10.64 includes specific heat mitigation measures that are intended to protect all offenders regardless of their individual risk level. (*Id.* at 4-6). These measures include making respite areas available 24 hours per day, seven days per week, for all offenders who are not assigned to air-conditioned housing. (*Id.* at 6). Offenders may request access to a

respite area even if they are not feeling ill at the time of the request and are permitted to stay in the respite area as long as necessary." (*Id.*). In addition, offenders requesting such access "are not required to be seen by medical staff unless they are exhibiting signs or symptoms of a heat-related illness." (*Id.*).

Pursuant to AD-10.64, drinking water and cups are required to be available to every offender during periods of excessive heat, and hydration is encouraged. (*Id.* at 4). This directive also requires prison units to take extra precautions where the heat index is above 90 degrees, including, but not limited to:

- Providing additional water and cups in offender dorms, housing areas, recreational areas, and during mealtimes, along with ice;

- Transporting psychiatric inpatient offenders to other facilities via air-conditioned transfer vehicles only;

- Transporting offenders during the coolest hours of the day, when possible;

- Allowing offenders to utilize and carry cooling towels;

- Allowing offenders to wear shorts and t-shirts in dayrooms and recreational areas;

- Ensuring maintenance of fans, blowers, and showers in offender housing areas;

- Allowing additional showers for offenders when possible;

- Lowering the water temperature for single temperature showers in offender housing areas;

- Placing posters in housing areas reminding offenders of heat precautions and the importance of water intake, and ensuring all posters that have been damaged or destroyed are replaced; and

- Allowing fans for offenders in all custody levels, to include restrictive housing and disciplinary status, and ensuring the fan program is in place allowing the permanent issuance of fans to indigent offenders.

(*Id.* at 7-8).

Pursuant to AD-10.64, the wardens at the TDCJ units are instructed to implement additional precautions when excessive heat or heat-wave conditions last more than three consecutive days by initiating the Incident Command System (ICS). (*Id.* at 8). Under these conditions, wardens may restrict and potentially cancel outside work and recreation as well as reduce kitchen and dish room operations as needed. (*Id.*). Offenders are also permitted to purchase "electrolyte sports drinks from the unit commissary without affecting their spending limit." (*Id.*).

Under the AD-10.64, TDCJ recognizes that "some offenders are potentially at a heightened risk of heat-related illnesses because of their age, health conditions, or medications." (*Id.*). Accordingly, AD-10.64 explains that inmates are assessed an automated heat sensitivity score using information from the inmate's medical records and that "[o]ffenders who have a heat sensitivity score receive priority placement in a housing area that is air-conditioned." (*Id.* at 8-9).

AD-10.64 contains additional provisions for first-aid measures in the event of a heat-related illness or injury and features a standardized annual training program that is

required at each unit to ensure prevention of injuries due to excessive or extreme temperatures. (*Id.* at 9-11). Training is required for both officers and offenders. (*Id.* at 10-13). TDCJ staff is required to complete hot weather training annually, no later than April 15 of each year. (*Id.* at 11). Offenders, in connection with their training are provided with an information flyer for heat, cold, and suicide prevention as well as with "unit-specific heat mitigating measures upon arrival at a new unit." (*Id.* at 12).

Director Sanchez testified that AD-10.64 is implemented at all TDCJ prison units from April 15 through October 30 every year.  (D.E. 121, pp. 56, 62).  He further testified that:

- Under AD-10.64, TDCJ provides respite areas, cold showers, and distributes ice water.  (*Id.* at 56).

- Respite refers to areas in the unit that have air conditioning.  (*Id.* at 58).

- TDCJ provides training to staff and inmates during the heat of the summer months.  (*Id.* at 56-57).

- All inmates under the excessive heat policy are afforded respite, and there are no limitations as to how often an inmate can go to the respite areas and how long they can remain in respite areas.  (*Id.* at 56-57, 59, 63).

- The following heat mitigation measures are available to inmates in and around their cells: cold showers, cool running water, cool towels, the ability to purchase fans and electrolytes, and cold water.  (*Id.* at 58).

In echoing and expanding on Director Sanchez's testimony regarding  available respite measures, Warden Holmes testified that:

- The following heat mitigation measures went into effect on April 15: water rounds, ice rounds, alteration of outside activities, the reduction in inmates going outside, lightening of workloads, and the availability of respite areas and showers.  (*Id.* at 92-93).

- Inmate are assigned to ice crews and are designated to refill coolers in the B-side of the building where Plaintiff is housed.  (*Id.* a 93).

- Showers are located in the B-side of Plaintiff's building with one shower designated to be a cold shower.  (*Id.* at 93-94).

- Plaintiff's cell is located close to the shower area.  (*Id.* at 96).

- Plaintiff has access to both the water cooler and the shower and does not require an escort to respite areas.  (*Id.* at 94).

- Inmates are allowed to visit respite on request.  (*Id.*).

- Plaintiff has two fans in his cell.  (*Id.* at 98).

- The McConnell Unit has various areas available for respite, including areas in the medical department, the visitation area, and the 12 Building.  (*Id.* at 98-99).

Compelling evidence was nevertheless presented at the evidentiary hearing to show that the heat mitigation measures referenced by Director Sanchez and Warden Holmes were not readily available to Plaintiff, especially during the current heat wave.  Plaintiff testified that, between June 9 and 13, 2023, he sought respite between eight and twelve times and was only allowed to go to respite on two occasions for 30 minutes each.  (*Id.* at 23-24).  According to Plaintiff, officers told him that the respite areas were full or that he would otherwise be fine.  (*Id.* at 24).

Plaintiff testified that, from June 13, 2023 until the date of the hearing, he sought respite around 28 times and that he was told on each occasion except one that the respite areas was full.  (*Id.* at 30).  Defendants presented evidence in the form of Respite Tracking Forms which show that Plaintiff was brought to an air-cooled location on two days, July 10 and July 12, 2023, where he stayed in respite on each occasion for over an hour.  (D.E. 115-3).  Despite a minor discrepancy between Plaintiff's testimony and these Respite Tracking Forms, the evidence shows that Plaintiff's requests for respite were denied on many more occasions than they were granted.  The testimony of both Director Sanchez and Warden Holmes suggests that space limitations as well as staff shortages impacted whether respite requests are granted or how quickly inmates could be taken to respite.  (*Id.* at 64, 67, 114).  However, the numerous denials of Plaintiff's requests run counter to the provisions AD-10.64 which requires prison officials to make available respite areas available 24 hours per day, seven days per week, for all offenders who are not assigned to air-conditioned housing. (D.E. 115-1, p. 6).  Plaintiff's compelling testimony as to the numerous denials of respite also belies any suggestion by Director Sanchez that inmates such as Plaintiff have no limitations as to how often an inmate can go to and stay in respite.[2]

As troubling as the evidence regarding the denial of Plaintiff's numerous requests for respite is, the undersigned finds even more disturbing Plaintiff's testimony about his numerous requests seeking medical treatment for heat-related illnesses being denied.  By way of background, the evidence shows that Plaintiff has heat-related work restrictions in

---

[2] In an affidavit submitted to the Court after the evidentiary hearing, Plaintiff states that he continues to be refused respite and that he continues to suffer as a result.  (D.E. 123, p. 1).

place in the form of no work in extreme heat and no work in direct sunlight.  (D.E. 121, pp. 15, 77).  In addition, Plaintiff testified that he is on the Heat Restriction List which entitles him to: (1) twice as much water and ice; (2) respite upon request; and (3) cold showers upon request.  (*Id.* at 22-23).  The evidence shows that officers are required to carry around with them the Heat Restriction List when they perform their health and wellness checks.  (*Id.* at 22).

Despite the uncontroverted evidence showing Plaintiff's susceptibility to excessive heat conditions, Plaintiff's testimony reflects that he sought out medical treatment numerous times between June 9 and 13, 2023, for heat-related illnesses but was denied on each occasion except one.  (*Id.* at 18-20).  According to Plaintiff, officers told him he would be fine and to get over it rather than assist him with getting immediate medical treatment as mandated by AD-10.64.  (*Id.* at 18).  From June 13, 2023 until the date of the evidentiary hearing, Plaintiff indicated that he had submitted numerous I-60 or sick call requests regarding the heat-related illnesses suffered each day during the heat wave.  (*Id.* at 29).  Plaintiff's testimony and the objective medical evidence submitted reflect that he was seen by a medical provider only on one occasion during this time period, July 12, 2023.  (*Id.* at 29; D.E. 115-6, pp. 2-6).

In connection with his July 12, 2023 visit, Plaintiff submitted an I-60 sick call request indicating that he had passed out five times during the previous two weeks due to "heat syncope."  (D.E. 115-6, p. 2).[3]  Physician Assistant Ronald Holdorf ("PA Holdorf")

---

[3] Dr. Kwarteng explained that "heat syncope" occurs when heat causes the body to sweat and lose water, which in turn leads decreasing blood pressure and passing out.  (D.E. 121, p. 75).

diagnosed Plaintiff with heat intolerance, directing Plaintiff to be "medically unassigned" for 180 days.  (*Id.* at 4).  Despite a medical provider's recognition of Plaintiff's intolerance to excessive heat, Plaintiff states in his post-hearing affidavit that he continues to be denied medical attention for continual heat related illnesses.[4]  (D.E. 123, p. 1).

The undersigned finds Plaintiff's testimony regarding the numerous denials of respite requests and medical attention for daily heat-related illnesses to be highly credible. While it is clear many heat mitigating measures under AD-10.64 have been implemented at the McConnell Unit during this summer, Plaintiff has shown that many important measures have been largely unavailable to him and have otherwise been insufficient to protect him against a substantial risk of harm.  The record contains evidence that space limitations as well as staff shortages have impacted whether respite requests are granted or how quickly inmates could be taken to respite. Plaintiff's testimony, however, suggests that that McConnell Unit officials are ignoring his symptoms and heat sensitivity by simply denying outright his numerous requests for both respite and immediate medical treatment for his serious heat-related illnesses.

Plaintiff's allegations in his Second Amended Complaint reflect that he has been denied many requests for respite measures from excessive summer heat and that such denials have resulted in him passing out.  (D.E. 56, pp. 5-6).  Plaintiff describes the temperature conditions in his cell and in the common areas during the current summer heat

---

[4] At the hearing, Dr. Kwarteng testified that he was not aware of any instance where Plaintiff presented with severe heat distress symptoms. (D.E. 121, 72).  Dr. Kwarteng further found nothing in the July 12, 2023 clinical notes as evidence of severe heat distress.  (*Id.* at 73).  Dr. Kwarteng acknowledged, however, that passing out from heat is a serious matter. (*Id.* at 89).  Dr. Kwarteng further acknowledged PA Sandoval's diagnosis of "heat intolerance" and could not explain why this diagnosis did not appear on Plaintiff's list of recognized medical conditions.  (*Id.* at 84).

wave as exceeding 90 degrees and reaching triple digits.  (D.E. 121, p. 31).  Temperatures taken near Plaintiff's cell by prison officials during the week of the evidentiary hearing average between 88 and 94 degrees.  (D.E. 121, p. 108).  Plaintiff's testimony and affidavit show that the issues involving the denial of respite measures – along with denial of suitable medical care for heat-related illnesses – have nevertheless continued in the current heat wave.

The evidence shows, as reflected by his recent diagnosis of heat intolerance and testimony about passing out numerous times during this severe summer hat wave, that Plaintiff continues to suffer heat-related illnesses due to his susceptibility to excessive heat conditions and that McConnell Unit officials have failed to take appropriate and required steps under AD-10.64 to reduce Plaintiff's risk of serious harm.   Accordingly, the undersigned finds that Plaintiff has demonstrated at this time a substantial risk of serious illness or death resulting from the current conditions at the McConnell Unit.

### 2.  *Plaintiff has shown that Defendants have acted with deliberate indifference to his health.*

"Deliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001). To prove the subjective prong of the deliberate indifference test, the inmate must establish that the prison official "had subjective knowledge that the inmate faced a substantial risk of harm [to the inmate's health and safety] and … [consciously] disregarded the risk." *Valentine v. Collier*, 993 F.3d 270, 281 (5th Cir. 2021); *see also Lawson v. Dallas Cnty*, 286 F.3d 257, 262 (5th Cir. 2002).

A prison official's knowledge of substantial risk may be inferred if the risk was obvious. *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006). The Fifth Circuit nevertheless has "consistently recognized . . . that 'deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm.'" *Dyer v. Houston*, 964 F.3d 374, 381 (5th Cir. 2020) (quoting *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 458-59 (5th Cir. 2001)); *see also Aguirre v. City of San Antonio*, 995 F.3d 395, 420 (5th Cir. 2021) ("Negligence or even gross negligence is not enough, the officials must have actual knowledge of the substantial risk"). The Supreme Court further explains that "an official's failure to alleviate a significant risk that he should have perceived but did not" falls short of constituting deliberate indifference. *Farmer*, 511 U.S. at 838.  Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of humankind. *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997) (citations omitted).

Dr. Leonardson, a physician employed by the UTMB, provided testimony at the evidentiary hearing regarding a Heat Score, which is calculated for each TDCJ inmate to identify those inmates at increased risk of injury during excessive heat conditions.  (D.E. 121, p. 39-48).  She testified as follows:

- An inmate's heat score is calculated through the identification of conditions or combination of conditions – such as diseases, age, medications taken, etc. – which provides the criteria for calculating the inmate's heat score.  (*Id.* at 40, 47-48).

- The Heat Scoring Sheet, submitted into evidence, lists the conditions or combination of conditions that indicate whether an inmate should be assessed points on his or her Heat Score.  (*Id.* at 50-51).

- If an inmate has a positive score (one point or higher), he or she would receive a recommendation to be moved to an air-conditioned cell.  (*Id.* at 51-52).

- Medical providers and nurses place an inmate's medical information into the Electronic Health Record ("EHR"), and this information is used by UTMB officials to determine the inmate's heat score.  (*Id.* at 40-21 , 48).

- UTMB then electronically transmits an inmate's updated heat score to TDCJ based on the inmate's current medical health information.  (*Id.* at 41).

- Inmates' heat scores are managed within the TDCJ's computer system. (*Id.*).

- Medical directors and other providers working at the TDCJ prison units have no direct role in calculating the heat score.  (*Id.* at 41-42).

- If a unit medical provider has concerns about an inmate in heat distress, that provider may contact the Health Services Liaison ("HSL"), which is a medical group within the TDCJ.  (*Id.* at 42).

- The HSL, which functions as a liaison between UTMB providers and TDCJ, will then decide whether the inmate is suffering from conditions that require a transfer to an air-conditioned cell.  (*Id.*).

- An inmate's work-related heat restrictions are not included in the heat score algorithm.  (*Id.* at 47).

- Medical providers have no authority to order air-conditioned housing for any inmate.  (*Id.* at 42).

Defendants submitted into evidence: (1) a Heat Scoring Sheet, which details the types of heart, neurologic, psychiatric, mental, and age conditions that would lead to a score of one point for each listed condition or disorder (D.E. 115-2); and (2) Plaintiff's current

List of Medical Conditions (D.E. 115-5).   This list shows that Plaintiff suffers from a number of physical conditions as well as PTSD.  (D.E. 115-5)  A review of Plaintiff's list of conditions, however, does not reflect that he suffers from any physical or mental conditions that would lead to being assessed one point on  the Heat Scoring Sheet.

Despite the fact that Plaintiff does not have a positive Heat Score, the evidence shows that Plaintiff is subject to heat-related work restrictions and that he was placed on the Heat Restriction List.  (D.E. 121, pp. 15, 22, 77).  AD-10.64 specifically references the "Heat Restriction List" as a "list of offenders with restrictions related to physical activities, transportation, and work that have been entered in the restrictions Module of the electronic health record (HER) and transmitted to the TDCJ mainframe HSIM screen."  (D.E. 115-1, p. 2).  The policy further provides that:

> During each security round, staff shall use the Heat Restriction List to conduct wellness checks for offenders on that list.  Staff shall immediately seek care for any and all offenders requesting medical assistance or exhibiting signs of illness, even if they are not listed on the Heat Restriction List.

(*Id.* at 6).  These provisions in AD-10.64 recognize that inmates on the Heat Restriction List require extra attention and assistance during excessive heat conditions.

Director Sanchez and Warden Holmes each testified that, under AD-10.64, McConnell Unit officers receive training in the beginning of April each year to identify inmates with heat illnesses and that TDCJ provides officers and inmates training on excessive heat conditions during the summer months.  (D.E. 121, pp. 56-57, 102).  Director Sanchez testified that officers are trained with regard "to housing and respite areas, cold

showers, water, [and] what signs to and symptoms to look at for any type of heat distress."
(*Id.* at 57).   Warden Holmes confirmed that McConnell Unit officers carry around with
them the updated Heat Restriction List at all times and that officers are trained particularly
to pay close attention to inmates, like Plaintiff, on the Heat Restriction List.   (*Id.* at 102-
03).

      Plaintiff's allegations in his Second Amended Complaint as well as his testimony at
the evidentiary hearing reflect that he has suffered several instances of heat-related
illnesses that have caused him to exhibit heat-related distress symptoms and ultimately pass
out.   (D.E. 56, pp. 5-6; D.E. 121, pp. 14, 17, 31-32).   His testimony indicates that
McConnell Unit officials were well aware of Plaintiff's heat-related conditions, requests
for respite, and requests for medical attention.   The undersigned finds that Defendants were
aware of the substantial risk of substantial harm to Plaintiff given their knowledge or
awareness of the severity of summer heat waves in Texas – including the current rather
severe and long-lasting heat wave – and the evidence presented at the hearing regarding
the temperature conditions around Plaintiff's cell and other common areas.

      The Fifth Circuit recognizes that the mere presence of remedial measures does not
end the Eighth Amendment inquiry as such measures must be adequate to protect inmates
from the excessive heat.   *Webb v. Livingston*, 618 F. App'x 201, 209 n.7 (5th Cir. 2017)
(citing *Ball*, 792 F.3d at 592-93 and *Blackmon v. Garza*, 484 F. App'x 866, 871-72 (5th
Cir. 2012) (per curiam).   Here, the issue is not only whether the remedial measures under
AD-10.64 are adequate to protect Plaintiff from excessive heat conditions.   Rather, the

issue also extends to whether McConnell Unit prison officials deliberately made unavailable to Plaintiff important heat mitigation measures under the policy – such as meaningful respite in air-conditioned housing or immediate medical treatment to address his heat-related symptoms – even though they were aware of both Plaintiff's susceptibility to excessive heat and the serious nature of the Texas heat wave.

The evidence shows that, on the majority of occasions when Plaintiff sought relief, McConnell Unit officers denied or delayed Plaintiff respite in air-conditioned rooms and denied his requests for medical attention to treat his heat-related symptoms. (D.E. 121, pp. 18-20, 23-24, 29-30). When Plaintiff finally was seen by a medical provider on July 12, 2023, PA Holdorf diagnosed Plaintiff with heat intolerance. (D.E. 115-6, p. 4). Yet, as Plaintiff stated in his affidavit, prison officials continue to deny him respite and medical attention for his heat-related distress symptoms. (D.E. 123, p. 1).

AD-10.64 provides inmates with a comprehensive list of heat mitigation measures for all inmates, extensive staff training on heat issues, and extra procedures to address those inmates who are more at risk in excessive heat conditions. (D.E. 115-1). Despite having familiarity with the provisions of AD-10.64 and having received training to recognize inmates in heat distress, especially those inmates like Plaintiff on the Heat Restriction List, the evidence shows that McConnell Unit officials have continued to disregard the serious risks to Plaintiff's health through their actions in denying or delaying respite to him as well as denying him timely access to medical treatment during excessive heat conditions. Accordingly, Plaintiff have demonstrated that Defendants are acting with deliberate

indifference to Plaintiff's health in a sufficient manner to establish a likelihood of success on the merits of his Eighth Amendment claims.

### C. *Substantial Threat of Irreparable Injury*

As to the second factor, Plaintiff must show that a failure to grant this preliminary injunction poses a substantial threat of an irreparable harm.  *See Robinson*, 921 F.3d at 451. *Id.*  This means that a concrete injury will occur absent the granting of the injunctive relief. *See Texas First Nat. Bank v. Wu*, 347 F. Supp. 2d 389, 399 (S.D. Tex. 2004) (Hittner, J.). "'When an allege deprivation of a constitutional right is involved, … most courts hold that no further showing of irreparable injury is necessary.'"  *Cole*, 2017 WL 3049540, at *43 (quoting 11A Wright & Miller, FEDERAL PRACTICE & PRODEDURE, § 2948.1 (3d ed. 1998)).

As detailed above, the evidence shows that Plaintiff is susceptible to excessive heat conditions, that he has suffered numerous heat-related distress symptoms resulting in him passing out  both during past summers as well as the present summer heat wave,  that prison officials have denied him meaningful respite and medical attention on numerous occasions for his heat-related symptoms, and that temperature conditions in and around his cell and other common areas consistently range from 88 to 95 degrees.  (D.E. 56, pp. 5-6; D.E. 121, pp. 11-14, 17, 23-24, 18, 30-32, 108).  PA Sandoval recently noted in Plaintiff's medical record that Plaintiff is heat intolerant.  (D.E. 115-6, p. 4).  Because the evidence shows that Plaintiff has experienced heat distress and is at high risk of experiencing further heat-related illnesses during the current summer heat wave, the undersigned finds that Plaintiff

has demonstrated a substantial threat of irreparable harm should a preliminary injunction not be granted.

### D.  Balancing the Harms

Plaintiff must next show that that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted.  *Robinson*, 921 F.3d at 451. Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542 (1987).  "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (citation omitted).

Plaintiff seeks preliminary injunctive relief in the form of either being transferred to an air-conditioned cell and/or installing air conditioning in every housing area and all common areas.  (D.E. 106, p. 3; D.E. 121, p. 32).  No evidence was presented at the hearing regarding costs associated with installing air conditioning in the housing and common areas. However, as discussed below, Plaintiff is only entitled to preliminary injunctive under the PLRA that is "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary injunctive relief, and be the least intrusive means necessary to correct the harm." 18 U.S.C. § 3626(a)(2).  To the extent the Court orders Plaintiff to be relocated to an air-conditioned cell in the McConnell Unit until October 31, 2023, the undersigned finds that such a remedy should not negatively impact the public as

the McConnell Unit should have such housing space already available in one of its buildings.  Security concerns should also not be impacted in a way that would compromise public safety.  On the other hand, as outlined above, Plaintiff would be subject to a substantial risk of irreparable injury if not provided any remedy at this stage in the case.  Accordingly, Plaintiff has demonstrated that the "balancing the harms" factor also weighs in favor of granting a preliminary injunction.

### E.  The Public Interest

Under the fourth factor, Plaintiff must show that the grant of an injunction will not disserve the public interest." *Robinson*, 921 F.3d at 451.  "It is always in the public interest to prevent the violation of a party's constitutional rights."  *ODonnell v. Harris County*, 260 F. Supp. 3d 810, 821 (S.D. Tex. May 11, 2017) (Rosenthal, C. J) (citing *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (collecting cases).  As discussed above, the undersigned finds that a substantial likelihood of success exists with respect to the merits of Plaintiff's Eighth Amendment claims.  Accordingly, Plaintiff has demonstrated that the "public interest" factor weighs in favor of granting his motion for preliminary injunction.

### F.  Bond

Federal Rule of Civil Procedure 65(c) provides that:

> The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

"A federal court may waive this bond requirement." *Cole*, 2017 WL 2049540, at *44 (citing Fed. R. Civ. P. 65(c) and *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981)). The undersigned recommends waiving bond in this case as Plaintiff is proceeding *in forma pauperis* in this action and is seeking to enforce his Eighth Amendment rights. *See id.*

### G. The Remedy

The PLRA provides that:

> "In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period."

18 U.S.C. § 3626(a)(2). The PLRA further provides that:

> "The court shall not order any prospective relief that requires or permits a government official to exceed his or her authority under State or local law or otherwise violates State or local law, unless—
>
> (i)     Federal law requires such relief to be ordered in violation of State or local law;
> (ii)    the relief is necessary to correct the violation of a Federal right; and
> (iii)   no other relief will correct the violation of the Federal right."

18 U.S.C. § 3626(a)(1)(B).

28 / 31

The Fifth Circuit has explained that "[t]he PLRA greatly limits a court's ability to fashion injunctive relief." *Ball*, 792 F.3d at 598. "Under the PLRA, plaintiffs are not entitled to the most effective available remedy; they are entitled to a remedy that eliminates the constitutional injury." *Id.* at 599. "In Eighth Amendment cases, plaintiffs can only obtain a remedy that reduces the risk of harm to a socially acceptable level." *Id.*

Here, as discussed above, the undersigned finds that Plaintiff has demonstrated a likelihood of success on the merits of his Eighth Amendment claims against Defendants. Based on the evidence presented, Plaintiff has demonstrated at this time: (1) a substantial risk of serious illness or death resulting from the current conditions at the McConnell Unit; and (2) Defendants are acting with deliberate indifference to Plaintiff's health by denying him meaningful respite and medical attention as outlined in AD-10.64.

It appears to the undersigned that many of the problems encountered by Plaintiff could be effectively addressed and remedied through the proper and timely application of each heat mitigation measure set forth in AD-10.64. Rather than extend extra attention and precautions under AD-10.64 to inmates like Plaintiff who are on the Heat Restriction List through the timely granting of respite and medical attention, the evidence shows instead that Plaintiff's requests and pleas to officials when suffering heat-related symptoms are for the most part being refused. In addition to the actions of officials denying Plaintiff meaningful respite and medical attention when requested, the testimonies of Director Sanchez and Warden Holmes indicate that there are space limitations and staffing shortages at the McConnell Unit which would further impact the ability to provide inmates sanctuary

from the heat in a timely manner.  This is especially problematic for inmates like Plaintiff who have been identified as being susceptible to excessive heat.

Given these concerns about whether the provisions of AD-10.64 can and will be properly implemented on Plaintiff's behalf as well as the probability the summer heat wave will continue for the near future, the undersigned recommends that preliminary injunctive relief be granted to Plaintiff in the form of immediate transfer to an air-conditioned cell until October 30, 2023.  The time frame of the injunction corresponds to the date through which AD-10.64 is implemented every year.  (D.E. 121, pp. 56, 62).  It is the undersigned's understanding that air-conditioned cells are available at the McConnell Unit.  This targeted remedy to correct ongoing violations of Plaintiff's Eighth Amendment rights should not prove to be an onerous one for Defendants and will serve to protect Plaintiff's interests as this case remains pending.

## V.    RECOMMENDATION

For the foregoing reasons, the undersigned finds that Plaintiff has established each of the four elements entitling him to preliminary injunctive relief in this action.  The undersigned respectfully recommends, therefore, that the Court grant him preliminary injunctive relief in the form of immediate transfer to an air-conditioned cell in the McConnell Unit where he will stay until October 30, 2023, which corresponds with the date that the heat mitigation measures under AD-10.64 are implemented at the McConnell Unit.  The undersigned further respectfully recommends that the bond requirement of Rule 65(c) be waived.

Respectfully submitted on August 7, 2023.

_____
Julie K. Hampton
United States Magistrate Judge

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United* Servs. *Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(en banc).